***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gregory and the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the holding of the Deputy Commissioner. The Full Commission enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing on 18 July 2002 as:
 STIPULATIONS
1. All parties are properly before the Commission and the Commission has jurisdiction of the parties and the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. The parties to this action are subject to and bound by the North Carolina Workers' Compensation Act.
4. Plaintiff is a 35-year old male with a date of birth of February 20, 1967 and was employed by Mastercraft Fabrics L.L.C. in 1996.
5. At all times relevant hereto, defendant was a duly qualified self-insured employer under the North Carolina Workers' Compensation Act with Hewitt Coleman Associates acting as defendant's third-party administrator.
6. Plaintiff's average weekly wage and compensation rate shall be determined by a Form 22.
7. The parties stipulated into evidence a packet labeled Stipulated Exhibit #1 and consisting of Industrial Commission Forms, plaintiff's personnel and medical records file with defendant, plaintiff's medical records, Piedmont Officials Association Application and Game Schedule and plaintiff's responses to discovery.
 ***********
Based upon the entire evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 35 years old and had received his GED. Plaintiff has a work history that includes forklift and tow motor experience. Plaintiff is a certified forklift operator. Plaintiff's hobbies include playing sports and refereeing basketball games. Plaintiff has refereed boys and girls junior varsity and middle school basketball games for three to four years.
2. Plaintiff began his employment as a warehouseman with defendant-employer in approximately October 1996. Plaintiff's duties included driving a forklift or tow motor and working the bander machine, which places plastic bands around boxes of yarn for shipping. Plaintiff's duties also included moving boxes of yarn to the bander, pushing them up into the bander and banding the boxes that would then go down the bander. Plaintiff also performed inventory, which could involve climbing a ladder. However, his supervisor Lee Padgett indicated that plaintiff's job duties while working under the supervision of Mr. Padgett did not include climbing ladders. Plaintiff also performed computer keying to make labels for boxes, cleaned the yarn bins and relocated yarn to the proper bin.
3. Prior to his alleged injury by accident plaintiff had been reprimanded for absences and sleeping on the job. In fact, in the last seven months of his employment, plaintiff received three documented counselings for unexcused absences with the last counseling being a written warning. Furthermore, on October 24, 2000, plaintiff received his final warning for sleeping on the job.
4. Plaintiff alleges that he injured his right knee while working for defendant-employer on third-shift as a warehouseman on June 5, 2001 when he hit his right knee on the steering column of a tow motor while getting into the tow motor and sticking his right leg through it and bumping the steering column. Former plant nurse Lavonda Shires treated plaintiff's knee with ice and Ibuprofen. Otherwise, plaintiff did not seek medical attention for approximately 3 weeks. In fact, plaintiff continued to work full duty after the incident and did not seek medical treatment until three weeks later when he was seen by Robert Charles DuCharme, P.A. on June 27, 2001.
5. On June 27, 2001, plaintiff reported to Physician's Assistant DuCharme hitting his knee two weeks earlier with unresolved pain. Plaintiff's exam at this time revealed no effusion and very little other than subjective pain. Plaintiff was diagnosed with retropatellar pain syndrome or pain behind the knee. X-rays were normal and the physical exam revealed basically the same results for both knees. In fact, plaintiff's anterior cruciate ligament (ACL) laxity was basically equal bilaterally. Plaintiff was released to return to work without restrictions and in fact returned to work full duty at his regular job as a warehouseman.
6. Almost three weeks later, on July 16, 2001, defendant-employer gave plaintiff a final warning for attendance in that he had missed 80 unauthorized hours in the last 12 months. The accumulation of another 16 hours of unauthorized absences from work would have subjected plaintiff to termination. Even though almost three weeks had passed since plaintiff's last medical treatment and during which time plaintiff had worked full duty at his regular job, plaintiff returned to see Physician's Assistant DuCharme later that same day for another evaluation of his right knee.
7. On July 16, 2001, a month and a half after the alleged injury of June 5, 2001, plaintiff's exam revealed some changes and new findings including effusion, possible meniscus involvement indicated by a positive McMurray's test and ACL laxity. For the first time, plaintiff elaborated on his description of the alleged injury and indicated that he twisted his right knee. Also, during this exam, plaintiff discussed his basketball refereeing and sports activities. Physician's Assistant DuCharme felt that plaintiff's problems may have pre-existed the June 5, 2001 injury but plaintiff maintained that he had never experienced popping of his knee prior to the alleged work-related injury. Plaintiff was provided with a knee immobilizer and restrictions to work his assigned duties at his own pace and discretion. Physical therapy was also recommended. Three days later, on July 19, 2001, without examining plaintiff, Physician's Assistant DuCharme amended these restrictions to include no climbing.
8. On the evening of July 16, 2001, plaintiff returned to work and spoke with his supervisor Mr. Lee Padgett about his visit to Physician's Assistant DuCharme. Mr. Padgett inquired about any restrictions, but plaintiff indicated that Mr. Padgett would have to get his restrictions from the plant nurse. As a result, Mr. Padgett told plaintiff to do what he could. The following morning, Mr. Padgett spoke with Lavonda Shires, the plant nurse, and learned what plaintiff's restrictions were.
9. When plaintiff and Mr. Padgett returned to work the evening of July 18, 2001, they discussed the restrictions. Plaintiff complained of knee pain and Mr. Padgett concluded that plaintiff could not operate the forklifts because of both the climbing involved and the knee immobilizer, which presented a serious safety concern in that plaintiff's leg protruded from the forklift cab. Therefore, Mr. Padgett requested that plaintiff perform the bander duties of the warehouseman job at his own pace and discretion. No heavy lifting or climbing would have been involved and the job is part of plaintiff's regular job as a warehouseman. Furthermore, plaintiff could run the bander basically standing in one place and receive any needed assistance. However, plaintiff requested to leave due to pain and refused to attempt the bander job stating, "it wasn't his job." Mr. Padgett asked plaintiff again if he would try the bander job. When plaintiff again refused, Mr. Padgett felt that plaintiff was insubordinate in refusing to even attempt the job and therefore contacted his supervisor, Philip Freeman who instructed Mr. Padgett to again request that plaintiff perform the bander duties with Les Scoggin as a witness. Therefore, Mr. Padgett and Mr. Scoggin met with plaintiff and Mr. Padgett asked plaintiff again if he would attempt the bander job. According to plaintiff, he told Mr. Padgett that he could not answer the question, but that he was not refusing to do the job. According to Mr. Padgett, plaintiff responded by stating merely that he was not going to do anything but his specific job.
10. Mr. Scoggin corroborated Mr. Padgett's testimony. According to Mr. Scoggin, plaintiff responded by indicating that he would not perform anything other than his job. Furthermore, when Mr. Padgett asked plaintiff why he would not attempt the bander job duties, plaintiff responded again by stating that he would do nothing other than his job. When Mr. Padgett asked plaintiff if he was refusing to do the bander job, plaintiff would not answer.
11. After this meeting, Mr. Padgett again contacted Mr. Freeman who requested that he again approach plaintiff regarding whether he would perform the bander job. Mr. Padgett again asked plaintiff to perform the bander job and plaintiff again responded that he was not going to do anything but his job.
12. During these conversations between Mr. Padgett and plaintiff, plaintiff insisted on having his own witness. Plaintiff contends that he did not refuse to perform any job but rather merely insisted upon having a witness. Company policy does not provide for a witness when work instructions or duty assignments are given. Furthermore, plaintiff's conduct and his statements that he would do nothing other than his job are tantamount to refusing to perform the bander job.
13. As a result of plaintiff's refusal to attempt the bander job, Mr. Padgett sent plaintiff home on July 18, 2001.
14. Subsequently, Rebecca Stevens, employment supervisor and acting human resources manager, and Wyndle Kingsmore investigated plaintiff's insubordination and refusal to comply with Mr. Padgett's reasonable request that plaintiff attempt the bander job. As part of this investigation, they interviewed plaintiff, Mr. Padgett, Mr. Scoggin and Mr. Freeman. According to Ms. Stevens, the hearing testimony presented by Mr. Padgett and Mr. Scoggin was consistent with their report to Ms. Stevens and Mr. Kingsmore during the investigation. When Ms. Stevens asked plaintiff why he would not try the bander job, he repeatedly stated that he did not refuse to do his job. Because of plaintiff's insubordination, the decision was made by Mr. Freeman, Ms. Stevens and Mr. Kingsmore to terminate plaintiff for insubordination effective July 24, 2001.
15. When Mr. Freeman and Ms. Stevens informed plaintiff of his termination, plaintiff became angry. Plaintiff called Mr. Freeman derogatory names and said, "Hey, you think this is funny . . . wait till I catch you outside." Barbara Toney confirmed this outburst.
16. Defendant-employer's policy provides for termination for refusal to perform reasonable duties or for insubordination. Furthermore, defendant-employer has terminated six employees at the two Spindale plants other than plaintiff for insubordination since 1997. According to Ms. Stevens, other than plaintiff none of the employees terminated for insubordination had filed workers' compensation claims. Plaintiff had received past counselings and written warnings for behavior issues and absences. Furthermore, during the final written warning regarding sleeping on the job on October 24, 2000, plaintiff mentions that warping yarn was not part of his job which supports the credibility of defendant's witnesses regarding plaintiff's refusal to perform the bander job.
17. Thereafter, plaintiff returned to Physician's Assistant DuCharme on August 2, 2001 continuing to complain of pain. Plaintiff's exam once again revealed effusion and ACL laxity. Plaintiff at this time elaborated even further regarding the mechanism of injury and indicated that he injured his right knee when he banged it against the tow motor and then reacted and pulled his right knee back and then jammed it into the ground bent underneath him. At this exam, plaintiff's right knee produced an audible and palpable click, a finding not found on previous exams. Plaintiff was referred to an orthopedist, Dr. John E. Davis.
18. Plaintiff was seen by Dr. Davis of Mid-Carolina Orthopedic Clinic on August 10, 2001 and gave Dr. Davis a history of striking his right knee against a piece of metal after which his left foot slipped and he sustained a bending injury of his right knee. Dr. Davis' exam revealed very few objective findings including no effusion, no tenderness, no quadriceps atrophy, no crepitation, no instability, full range of motion and negative McMurray's and Lachman's tests. Plaintiff's exam revealed only questionable laxity and a questionable Anterior Drawer test. However, because of plaintiff's persistent complaints of discomfort, Dr. Davis ordered an MRI of plaintiff's right knee. The August 27, 2001 MRI revealed some increased T-2 signal at the prepatellar bursa consistent with prepatellar bursitis but otherwise, the MRI was normal.
19. Thereafter, plaintiff returned to Dr. Davis on August 28, 2001 at which time Dr. Davis remarked that plaintiff limps whether wearing his knee brace or not. Dr. Davis again found no abnormal objective exam results and no evidence of significant injury of plaintiff's right knee in light of the clinical exams, x-rays and MRI. Therefore, Dr. Davis recommended that plaintiff undergo a strenuous exercise program and return to full activity. Dr. Davis recommended no other treatment and plaintiff did not attend an appointment scheduled for September 11, 2001. Furthermore, Dr. Davis did not restrict plaintiff from work and did not recommend any further treatment other than exercise. There is no evidence that plaintiff sought or received any medical treatment after his last visit with Dr. Davis.
20. Following his termination, plaintiff continued refereeing high school basketball games. Furthermore, between November 15, 2001 and February 8, 2002, plaintiff refereed at least three scrimmages and thirteen full-length games. Each game consisted of four six, seven or eight-minute quarters, and required plaintiff to run up and down the basketball court. Furthermore, while plaintiff complained that his knee injury prevented him from working at a friend's car wash, he admitted to refereeing twenty-two (22) basketball games in Florida during the week prior to the hearing and to refereeing some church league basketball games since he was terminated.
21. In the almost twelve months between his termination and the hearing, plaintiff only applied for work with two employers. When asked why he had not tried harder to find work, plaintiff indicated that he did not apply for other jobs because he felt he should still be employed by defendant-employer.
22. While plaintiff may have sustained an injury by accident on June 5, 2001 when he bumped his right knee on the steering column of a tow motor, plaintiff's extent of injury is questionable. Plaintiff's description of his alleged injury has evolved over time. Significantly, the description changed for the first time after he received a final disciplinary warning relating to unexcused absences, an issue for which plaintiff had been counseled prior to his alleged work-related injury. In fact, plaintiff's story about how he injured his knee changed from hitting his knee, to twisting it, to striking the right knee on the steering column then slipping on the left foot and sustaining a bending injury of his knee on the ground. Plaintiff's testimony at the hearing was more consistent with his later descriptions but nevertheless plaintiff was somewhat vague regarding the mechanism of injury. Plaintiff testified that he hit his right knee on the steering column and that because it "jarred" him "so bad" his other foot "came out" and his right knee "went down in between the tow motor and the — the seat and the steering wheel".
23. The greater weight of the evidence fails to show that plaintiff sustained any significant or lasting injury to his knee as a result of any June 5, 2001 injury by accident.
24. Plaintiff has failed to show by the greater weight of the evidence that his need, if any, for additional medical treatment is causally related to the June 5, 2001 incident. Although Physician's Assistant DuCharme recommended physical therapy, which has not been provided, this recommendation was not made until July 16, 2001, almost a month and a half after the June 5, 2001 incident and after plaintiff's disciplinary warning and corresponding elaboration of the history of his injury. Furthermore, plaintiff told Physician's Assistant DuCharme that he played sports and refereed and that he had had knee problems before his alleged on-the-job injury. Moreover, Physician's Assistant DuCharme admitted that the condition of plaintiff's right knee or worsening of the condition on July 16, 2001 is also consistent with a sports injury. Moreover, it is not clear that plaintiff's current right knee condition is the result of the incident on June 5, 2001 as evidenced by plaintiff's first visit to Physician's Assistant DuCharme on June 27, 2001 when the condition of plaintiff's right knee was basically equal to the condition of plaintiff's left knee. Finally, Dr. Davis did not recommend any formal therapy just "vigorous exercise" and plaintiff has participated in extensive refereeing activities since this recommendation.
25. Plaintiff has failed to prove by the greater weight of the evidence that as a result of any injury by accident of June 5, 2001 he is unable to earn the same or greater wages in the same or other employment. Furthermore, plaintiff unjustifiably refused work within his restrictions by refusing to even attempt to perform the light duty work that was offered to him. Moreover, even though plaintiff's termination involved a dispute over light duty work or having a witness present during duty assignments, plaintiff was terminated for reasons unrelated to his June 5, 2001 injury for which another employee would have been terminated. Finally, plaintiff has failed to prove that since his termination he is unable to obtain other employment at the same or greater wages as a result of any work-related injury or disability.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. While plaintiff may have suffered an injury by accident on June 5, 2001, the greater weight of the evidence fails to show that plaintiff sustained any significant or lasting injury to his right knee as a result of any June 5, 2001 incident. N.C.G.S. § 97-2(6).
2. Plaintiff has the burden of proving the existence of disability and its extent. In the instant case, plaintiff has failed to prove by the greater weight that he is disabled as a result of any June 5, 2001 injury by accident and consequently entitled to workers' compensation benefits. N.C.G.S. § 97-2(9); Kennedy v. Duke Univ. Medical Center,101 N.C. App. 24, 398 S.E.2d 677 (1990); Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982); Russell v. Lowes Prod.Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
3. Even assuming arguendo that plaintiff did in fact sustain any disability as a result of the June 5, 2001 injury, plaintiff nevertheless has failed to prove entitlement to benefits due to his refusal to attempt the light duty position and his subsequent termination for reasons unrelated to his injury by accident for which another employee would have been terminated in accordance with defendant-employer's disciplinary policy, as plaintiff has failed to prove that after his termination he was unable as a result of any June 5, 2001 injury by accident to earn the same or greater wages. Seagraves v. The Austin Company of Greensboro,123 N.C. App. 228, 472 S.E.2d 397 (1996).
4. Plaintiff has failed to prove by the greater weight that any further recommended medical treatment for his right knee including physical therapy is causally related to any injury that occurred on June 5, 2001. Therefore, plaintiff is not entitled to additional medical treatment under the act as a result of his June 5, 2001 injury. N.C.G.S. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission modifies and affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Plaintiff's claim for additional workers' compensation benefits is hereby and the same shall be denied.
2. The parties shall bear their own costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER